Whyte, J.
I concur in the disposition of this cause made by the court, but I cannot give my assent to the construction of the act of Assembly-of 1817, ch. 99, contained in the opinions which have been read by my brother judges; and I regret the occasion that compels me to express this difference, having the greatest respect for the judgments that dictated the constructions therein made. But the question is an important one; it may be saidRhat it concerns every member of this community. The trial by jury has been justly styled the great palladium of our liberties, and the correctness of the mode of conducting it is most important. The passage of the act of 1817, ch. 99, proves this latter position, and shows that any attempted innovation therein will immediately receive the corrective and remedial interposition of the Legislature.
The act is in these words: “if a trial shall be commenced in any criminal prosecution or civil cause, before any court having cognizance of the same, and if, during the progress of the trial, a juror or jurors should become so unwell that, in the opinion of the court presiding in the trial, he or they are unable to serve, he or they may by the court be permitted to retire, and the sheriff shall be directed and required to summon, instanter, a juror or juors in his or their place or places, who shall by the direction of the court be sworn, and the trial be commenced de novo.”
The bill of exceptions shows, that the defendant, Garner, exhausted the number of peremptory challenges allowed him by law in that species of offence before the num *166 ber of twelve iurors were elected; but a iury was made up J 3 J J 1 and charged with the cause; and that one of the jurors composing this jury, afterwards was taken sick, and his attend--ing physician having come into court and testified on oath, that the juror during the previous night had been very sick, and was then unable to come into the court-house without endangering his health; that he was then under the operation of medicine, and was better, and he thought in a day or two he might probably be able to attend court, but not sooner. The court discharged the juror, and directed another to be summoned instanter; which was done. The defendant, Garner, claimed the right of challenge. The court decided, that having already exhausted his number of challenges, to wit, five, that he could challenge no more.
One of my brother judges is of opinion, that the circuit court was right in denying peremptory challenges to the prisoner, to be taken by him to the newly summoned juror. A majority are of opinion, that the defendant had a right to apply peremptory challenges to the extent of the number allowed by the law in that species of offence, to the new summoned jurors, as being suppletory to those who had been permitted to retire under the incidental occurrence disqualifying them for set vice. So far I concur with the opinion of the majority of my brother judges; but when in proceeding, they say, awe do not hold as in England, that in consequence of the withdrawn juror, the panel is broken up, and that entire selection de novo must follow. 4 Taunt. 309: 2 Leach, 620: 3 Camp. 209. The letter of the act which is directory, provides, that jurors shall be called to fill tíie vacated places; the jurors remaining, will be as so many selected and sworn; because of these last called and sworn, the pleadings will be read again, and the testimony heard de novo.” To this construction of the act I cannot possibly give my assent; it is a construction, in my very humble opinion, not authorized by the act, either in its letter *167 or in its spirit. A short view of the act, and of what I consider to be its true construction, will be taken. 1 would first observe, that it is to be noticed that my brother judges have not confined their examination to the particular species of offence charged in the indictment, which is only a petty misdemeanor, and in itself of little consequence, but-have extended their remarks, and that- very pertinently too, in my judgment, so as to embrace all criminal prosecutions whatever, including trials for life; which makes the case under these circumstances, a case of the first importance, and interesting to all. By thus comprehending within the scope of their observation, the trial by jury generally, in criminal cases, I am put upon the necessity of adopting somewhat of a greater latitude of remark upon the points discussed in the argument at the bar, than otherwise.
When the incidental occurrence of a juror becoming unwell has taken place, and.he has been permitted tore-tire, his place filled by another juror and him sworn, this constitutes the ground or jpasis, on which the superstructure of the enactment (de quo potissimum est sermo) which follows, proceeds; prescribing and directing what is to be done regarding the proceeding under this existing state of things. This direction in the terms of the act, is, that ££the trial shall be commenced de novo.” There is no ambiguity in the expression of the act, as being capable of having reference to a variety of objects, creating doubts as to its proper application, whether as predicated of the one or of the other of them: it is simple in its diction, plain in its meaning, and single in its object. This observation might be illustrated still further, were illustration necessary, by a translation or version of the expression in the statute, of “the trial shall be commenced de novo,” into the words, “the trial shall be begun anew.” I am altogether unable to perceive, how any other conclusion can be arrived at in the case, by this direction of the statute, than this: that from the incidental *168 occurrence which has taken place, the progress then made in the trial shall be done away, vacated and held for nought; and the prisoner shall stand.in the same relative situation on another trial, to the State, and the charge against him, and the proceeding thereon, which he stood in at the beginning or commencement of the first trial, the further progression in which has been stopped by the unforeseen occurrence. “Commenced de. novo;” this without more said, .virtually includes, that the trial shall begin and go on as before, according to law, tracing the former steps; no alteration in the new proceeding is directed, no diminution of the rights of either party is even hinted at; the prisoner maintains his former and first position, clothed with all his fights,-invested with all his privileges, and protected with all the solemnities of trial by jury. Such is my view of the act.
■ I now will proceed to show my reasons more particularly, for not concurring with the views taken by my brother judges. One of these views is, “that upon a juror’s becoming so unwell as to be unable for further service, he may be withdrawn from the jury; the sheriff shall sum-' mon another in his stead, who shall be sworn and substituted; then the pleadings and proofs shall be’reheard by the newly empannelled juror, as if not in part previously produced. The eleven jurors originally qualified are not to be sworn or any new empannelling to take place.” The new juror presented may be challenged for cause, not peremptorily.
I consider this construction altogether inadmissible, for the following reasons. ' First, because it is in direct opposition to the very face of the act. The act directs a new trial; this construction is a continuation of the first, or ■old trial. This may not be. In legal acceptation, the directing a new trial is the vacating the former trial, and when the'legislature use legal terms, they must be understood to have intended them in their legal sense; a trial to be commenced de novo, is incompatible with a continu- *169 anee of the old, or first trial: they cannot he made the same, and united m identity, so as to form one; they are twain, and divided in fact, as they are by the act divided in name, de novo. Again; it seems to me that it would be a most strained construction of an act of assembly to say, that after the legislature have made a plain and positive enactment, yet that they have made, by intend*ment, a reservation in oppugnancy to that enactment. But if such would have been the meaning of the Legislature, they would have used language to that effect, which could have been readily done by apt and appropriate words, as, the trial shall be proceeded on, the trial shall be progressed in. This would have indicated a continuance of what had preceded,' and a junction to what might follow after, so as to make an unit of the whole proceeding; which if they had done would have been incorrect in them, and unconstitutional, as I shall show hereafter. But the legislature had no such intention; if they had had such an intention, and acted upon it, it would have been in violation of all system, in hostility with all principle, and in opposition to all precedent. The legislature intended what the act has said; the trial shall be commenced de novo. This is in pursuance of the system of jury trial, supported by legal principles, and conformable to the precedents. See 1 Chitty’s C. L. 545: 4 Taun. 309. A second reason why I cannot concur with this construction of this act, is, that although it admits that the juror presented for substitution must be a good and lawful man, and may be challenged for cause, yet it denies to him a peremptory challenge. Now it is a settled principle of the trial by jury, that where peremptory challenges are admissible at all, they are admissible after a challenge for cause has been disallowed; and for this reason, that the very challenge might create in the mind of the juror so excepted to, a prejudice against the individual who made the objection. 1 Chitty’s C. L. 545: 6 Term, 531, King vs. Stone. I cannot therefore, give my assent to the en- *170 grafting a rule in the trial by jury, which for ages has been repelled, being injurious to the prisoner on his trial. 4 Bl. Com. 353: 2 Hawk. P. C. 582, sec. 10. That the pleadings and proofs are to be reheard I concur with, but not in the sense in which it is understood in the opinion delivered, that is, for the substituted juror or jurors’ benefit on a continuation of, and progression in the first, or old trial: they are to be read or reheard on the new trial for the benefit and information of all the jurors, including the substituted ones, if they should be elected on the panel of a new jury on the de novo, or second trial; which may, or may not be at the option of the prisoner, if within the range of his challenges.
But as the pleadings and proofs are to be gone through again, as admitted by all, why not the challenges? The act of 1817, ch. 99, is as silent respecting the one as the other; both must therefore stand upon the same ground, not upon any supposed superior expediency or necessity, as attached to the one and not to the other. But although the act is silent as to its speaking to these particulars in express terms, nominatim, yet it speaks aloud in the general, virtually, and not only sanctions, but requires both in the direction which it gives, that the trial shall be commenced de novo. In ordering a trial de novo, the act orders every thing belonging to it, and necessarily connected with it to give it existence in both substance and form, according to law. This is the principle upon which the pleadings are read again, the evidence given in anew, and the challenges taken afresh, and the steps of all the constituent parts of a trial by jury, are retraced upon a trial de novo, notwithstanding they may have all been acted upon on the first trial.
But, placing the rehearing of the pleadings and the proofs, on'the ground taken in the opinion delivered, that is, on account of the jurors last called and sworn, of of the new jury, ought not the challenges to be taken afresh on the same ground, that is, on account of the prisoner? *171 The right -of challenging, it is true, is a matter of indifference to the new jury; it adds nothing to their information, and is of no interest to them; not so to the prisoner; it is of thrilling interest to him; his liberty or his life may depend on its unabridged exercise, and why shall this most important part of a trial by jury be denied him? The jury trial disowns all favoritism; it acts between the parties with equipoised scales, and has for its object to make true deliverance between the State and the prisoner. The reason assigned for the refusing peremptory challenges to the prisoner on the trial de novo, is, because he had them before, when on his first or former trial. That reason, in my opinion, is not well founded; it does not meet the case; the prisoner is now on his trial, and it is to meet the eventual crisis of a present trial, not of a past one, that the law in its benignity interposes the shield of challenge. That former or first trial is annulled and done away, as completely as if it had never existed, imparting neither benefit nor injury to either of the parties to it, the State or the prisoner. By that partial trial the prisoner never was in danger; on the second, present, trial, he may be in danger, and to defend him against this danger, toties quoties, the law gives the challenges. My opinion that far is, that when the statute directs “the trial shall be commenced de novo,” a new trial in plain lan-gaage is directed; there is to be a trial de novo; this must be a whole trial, not a part of a trial, or a partial trial. There is no limitation enjoined and annexed to this direction of the statute, abridging its constitution, or dissevering from it any of its parts; but if anything farther is intimated by the expression, “to be commenced do novo,” it is the reverse of abridgment, rather implying plenariness, or fulness and completeness, being used majori cau-tela, in prevention of any encroachment upon this second proceeding of trial by jury, as the constitution of our parent State, North Carolina, speaks of it.
This meaning of the act of assembly is in strict accor^ *172 dance with the scheme of trial bv iury, which is á cófti-píete system, composed of various parts, connected together, but dependant, and co-operating to effectuate one main purpose; this in criminal prosecutions, is a correct deliverance of the prisoner. One part of this scheme is, that a jury empannelled, sworn and charged with the prisoner, is an entire thingpthough composed of twelve persons, in judicial proceedings it is an unit, and any disruption or derangement of its composition, destroys its legal existence. Thus, under the act of 1817, ch. 99, whenever a juror becomes unwell, and thereby becomes unable to serve, and is permitted by the court to retire, there ceases to be a jury in that cause, and the remaining eleven that were empannelled and sworn as jurors, together with the one returned, lose the character of jurors as being a part of a jury trial; but they then become fit subjects or persons to be presented again for acceptance or refusal, towards the formation of a second jury, the prisoner having the right to challenge them as if they had not ever been presented to him, and accepted by him on the first trial.
Chitty, in his very able work on the criminal law, has succinctly laid down this part of the system of the trial by jury. He says, in his first volume, page 545, “when a juryman is taken ill during the trial, so that the first jury is discharged, and the same eleven, with another, returned a 'second time instanter, the prisoner has a right to challenge any of them as if they had never been previously inserted in the panel. The prisoner may therefore, in prosecutions for treason, challenge thirty-five, and for felony twenty, peremptorily, and also challenge an indefinite number, on showing a sufficient reason.” This is an accurate summary of the common law of England at this day, and of the ancient common law, which is the law in this State, except as respects the number of challenges in felony, which has been altered by act of assembly in this State, as I shall presently show.
*173 The positions, then, that I lay down as to the disputed points in this case of the trial by jury, are these: first, that the act of 1817, ch. 99, is not at variance with the common law; and second, that the common law is the law of this State.
As to the first position, the act of assembly differs in nothing from the above quotation from Chitty, except as to the number of challenges above noticed. The act does not say, as has been said, that when the juror or jurors put in the place or places of those withdrawn, and by the direction of the court sworn, the trial shall proceed de novo; the act says directly the reverse, that the trial shall commence de novo. I have already shown that this is the fair and true construction, and I shall by and by show, that if it had said otherwise, it would have been repugnant to the constitution, and of course, of no force. The matter of challenging is not noticed in express terms by the act, but it is well and sufficiently provided for by the direction of “the trial shall be commenced de novo.” This direction virtually and necessarily comprehends every requisite preparatory to the commencement of the trial which the law requires; as the returning a panel, the taking and completing the challenges, both for cause, and peremptory if necessary, the making up a full jury of unexceptionable persons, and the administering to each of them the proper oath. Then the jury being thus assembled and sworn, the clerk gives the charge, and the trial commences. There is nothing in the act that either expressly or impliedly contravenes the well established course of proceeding in trial by jury. Nothing requiring that the jurors so summoned, instanter, shall, with those remaining of the first trial, compose a jury that must continue the first trial, and pass upon the fate of the prisoner. Nothing in oppugnancy to the course of it, that the proper number so made up is tobe presented to the prisoner for his reception or rejection; a consequence following the cesser of the first trial. The *174 remaining portion of the act, after the direction that the trial shall commence de novo, has reference to the validity and effect of the proceeding under the circumstance stated in the prior part of it: it says, “and the verdict, when rendered, shall he as effectual in law, as if the said juror or jurors last sworn, had been sworn when the jury was first empannelled, any law, usage or custom to the contrary notwithstanding.” This clause or portion of the act, as above remarked, refers to the effect of the proceeding above detailed in the act, pointing to the frequently stirred question, as to the effect of two trials upon the same indictment, whether the cesser of the first trial after the commencement of it, and the pleadings read and evidence given in to some extent, did or did not amount to an acquittal of the prisoner on the charge preferred against him, or in other words, render the verdict given on the second trial, invalid and ineffectual in law.
The Legislature of 1817, to quiet this question in future, in substance declare, that the cesser of the first trial, under the incidental circumstance of one or more of the jurors becoming unwell, and being permitted to retire, and their places filled by others instanter, shall not invalidate the verdict rendered by the second jury. This enactment of the statute is in accordance with every reported case, where the same or the like occurrence has had an existence. It never has been contended by the ■very learned and able lawyers of the crown, in England, that the sickness of a juror and his inability to attend, even after evidence given in, did not destroy the judicial existence of the jury, dissolve the connexion between them and the prisoner, and cause the members of it to be forthwith discharged. And on the other side, for the prisoner, the affirmative hath always been held; and by the counsel in defence, it hath been laid hold of as a plank on which to escape in a doubtful case, the standing a second •or new trial. This same objection was taken in the case, *175 Rex vs. Edwards, in 1812, cited by the counsel on argu-mentin the present cause; there Baron Wood overruled the objection, discharged that jury, and directed a new jury to be sworn, consisting of the same eleven persons who remained of the former jury, and another, and that they should be sworn, and the prisoner was directed by the judge to challenge each of them, if he would, as they came to the book to be sworn. See 4 Taunt. 309: 3 Camp. 207. The like objection was taken about two centuries ago, (15 Car I,) in the case of Manscomb, a juryman who wilfully absented himself; it was then decided that the eleven remaining cannot give any verdict; and the jury was discharged, and a new jury sworn, and new evidence given, and the verdict taken of the new jury. 2 Leach’s Crown Law, 620, notes. And the history of our own times shows, that the same objection has been raised here upon State trials, and as a consequence flowing from it, an immunity from the legal effect of the committing of crimes, has been argued, insisted on, and strenuously enforced by the first talents of the har, producing disquiet, and threatening to overturn in some material points, the proceedings in the trial by jury. To stem this torrent and calm the public mind, to prevent such discussion upon trial between the counsel for the State and the counsel for the prisoner, advancing positions which, though honestly and conscientiously advanced, yet propounding claims equally inadmissible on both sides, being neither warranted upon principle, nor sanctioned by uncontested usage, having a tendency to introduce innovation, the effect operating in derogation of the purity of the mode of proceeding, as established by the common law, were the causes and reasons of the passing of this act of 1817, ch. 99, declaratory of, and re-enacting what was the common law before, and so. considered to be from the first colonization of the country, or at the least, from the time of our revolution, *176 js apparent, being authenticated by the most sacred records.
But it may.be objected against the conclusiveness of this deduction from the act, that the re-enacting by statute what was the law before, is superfluous. This consequence is admitted, but-the fact is not the less true on that account. And we have many instances in our statute book, as is well known to the bar, of enactments by acts of Asserhbly, of parts of the common law; a practice though strictly speaking, unnecessary, yet has a salutary effect in the further promulgating and forcibly presenting of such parts to the public attention.
Having shown that the act of 1817, ch. 99, is not at variance with the common law in criminal prosecutions, I come' now to the second position laid down; that the common law is the law of this State also, in criminal prosecutions, except in a small matter regarding the number of challenges in some felonies and other inferior offences.
Our constitution, made and adopted in the year 1796, says, in the sixth section of the declaration of rights, “that the right of trial by jury shall remain inviolate.” What right of trial by jury is thus sanctioned and secured by the constitution? The answer is, “the trial by jury as it then existed in force and use at the time of the adoption of the constitution.” This trial by jury is the same that was handed down to us from the State of North Carolina, by her act of cession in the year 1789, the eighth express condition of which is in these words, “that the law in force and use in the State of North Carolina, at the time of passing this act, shall be and continue in full force within the territory hereby ceded, until the same shall be repealed or otherwise altered by the Legislative authority of the said territory.” This places our trial by jury'in identity with that of North Carolina, in force and use there in the year 1789; and I am not advised of any material change in it, made by her, subse *177 quent to the making and adoption of her constitution, which is in these words, in the declaration of rights, passed the 17th of December, 1776, sec. 14, “that in all controversies at law, respecting property, the ancient mode of trial by jury, is one of the best securities of the rights of the people, and ought to remain sacred and inviolable;” and in the constitution passed the 18th of December, 1776, sec. 44, “that the declaration of rights is hereby declared to be part of the constitution of this State, and ought never to be violated on any pretence whatever.” Every expression, and even word, in so important and solemn an instrument as a constituí ion,.we may presume, has been well weighed and duly considered in its formation; and the expression “ancient mode of trial by jury,” which announces the subject matter and cause for which the provision that follows is made, deserves in particular, our marked attention. To attain to its true import and meaning, it may be proper to premise* that our ancestors, when they came into this ne'w world, claimed the common law as their birth-right, and brought it with them, except such parts as were judged inapplicable to their state and condition. The common law thus claimed, was the common law of their native country, as it was amended or altered by English statutes in force at the time of their emigration. These statutes were not re-enacted in this country, but considered as incorporated into the common law. See 2 Mass. Rep. 134-5.
It is further to be premised, that the number of peremptory challenges at the common law, before any statutable regulation concerning them was made, in the cases of life was 35. 2 Hawk. P. C. ch. 43, sec. 5: 1 Inst. 156, b. That this number was reduced to 20 in. petit treason, murder and felony, by statute 22 Henry VIII, ch. 14, sec. 6; and by statute 33 H. VIII, ch. 23, peremptory challenges were taken away in high treason. But the statute 1st and 2d of Philip and Mary restored trials in trea- *178 gon to the course of the common law to thirty-five peremptory challenges. These statutes make the common law of England, at the time of the emigration of the first settlers of North Carolina, allow thirty-five peremptory challenges in treason, and twenty in murder and felony, which common law these first settlers brought with them, and which was the common law of North Carolina, at and before the making of their constitution in 1776.
Having premised these remarks, I will now return to the constitution of North Carolina, and notice the expression “ancient mode,” and submit what I consider to he its .true meaning, which is confined to the alternative of being, either the common law as it existed before the 22d of Henry VIII, or the common law as it existed after-wards. The term “ancient,” as it shows the quality of its annexed substantive, chnode,” is important in fixing the meaning of this latter. “Ancient,” is a correlative term, and has for its correlate, as standing in the opposition, the term “modern;” under this criticism the description “ancient mode of trial by jury,” means the mode of trial by jury as it was at common law, before the statute of 22 H. VIII, ch. 14, sec. 5. But if this criticism is not correct, then the common law of North Carolina, from the time of its settlement to the passage of the act of assembly of Nov. 1777, chap. 2, sec. 94, allowed thirty-five peremptory challenges in treason only, and twenty in murder . or other felonies. That act of 1777 restored (suppose the constitution did not) the ancient mode of trial by jury, according to the course of the common law. It says, “and every person on trial for his life, may make a peremptory challenge of thirty-five jurors.” Our act of August, 1794, ch. 1, sec. 71, enacts the same provision in the same words, saying, “and every person on trial for his life, may make a peremptory challenge of thirty-five jurors.” Both these acts of assembly of North Carolina and of Tennessee, are in affirmance of the ancient mode of trial by jury, according to the course of the com *179 mon law; and in addition, have the solemn sanction and pledge oí the constitution of the State of Tennessee, that it shall remain inviolate.
To conclude, the preservation of the trial by jury in all its purity, is of the first importance; a strict adherence to its form, in all its parts, is not to be dispensed with, or to be considered as captious or trifling. It is to be watched with a jealous assiduity, and the slightest deviation from the established mode of proceeding regarded as affecting our dearest interests, and as such to be instantly put down: bearing constantly in our minds, that it is' one of the best guards of our rights, of our property, of our liberty, and our lives.
The force of these suggestions may not at once make its impress on the mind of him who stands well in society, and much less reach the attention of the rich, surrounded with their wealthy possessions, and consequent friends, giving them an influence and a consideration repulsive to dangers, and which the weight of character would overpower and render silent. But look at the case of the poor man; view his situation, what are his attractions for consideration; low in estate, little known, less noticed; and if .regarded at all, it is with a callous indifference bordering on insensibility. But let it be remembered, that to this man of low estate, on this awful hour of deliverance between him and the State, upon life, the trial by jury, in all its purity of form and substance, is to him his riches, his wealthy possessions, his influence, and his attractive considerations. I say-of this trial in all its purity, let him not be despoiled.
Catron, Ch. J.
To the opinion of my brother judges on the first point, I agree. It is adjudged in accordance with the case of Johnson vs. The State, (Martin and Yerger’s Rep. 129,) not to be disturbed.
As to the second point, I feel myself unable to concur in the construction given to the act of 1817, ch. 99. The *180 act applies to civil and criminal causes. If a juror becomes so unwell as to be unable to further serve, he may be withdrawn from the jury; the sheriff shall summon another in his stead, who shall be sworn and substituted, when the pleadings and proofs shall be reheard by the newly empannelled juror, as if not in part previously produced. The-eleven jurors originally qualified are not again to be sworn,- or .any new empannelling to take place. - .
The .difficulty-here, is as to the right of challenge. The juror presented is to be a good and lawful man, and of course, open to challenge for cause. So if the State or the defendant in a criminal cause, or either party in a civil cause, has not theretofore exhausted his peremptory challenges, he may so challenge. I conceive the act of 1817, never contemplated that in the selection of this one juror, a defendant might have thirty-five, twenty, or five, peremptory challenges, the whole number allowed when he had twelve to select.
It is strongly impressed upon us, that this construction will endanger liberty, and the right of trial by jury. My experience at tfie bar has taught me, that escape from punishment is quite as likely to follow a contrary construction. To give a defendant, in a capital case, seventy peremptory challenges, would but too often result in a defeat of the prosecution. That the legislature did not intend to give seventy challenges in cases of the highest grade, forty in those of the second, and ten in every of-fence beneath the grade of petit larceny, should the contingency of a juror sickening occur, is to my mind so manifest, that I feel myself unauthorized to concur with my brother judges. The right of trial by jury, in this instance at least, was. not impaired. Previous to 1S29, (c. 55,) a defendant in a case of extortion was entitled to no peremptory challenges; the legislature gave the defendant and the. State, each the right to five. Had this act not been passed, then by the act of 1817, a juror would *181 have been substituted without any power on the part of the defendant to challenge him, unless for cause. Having challenged five before the sick juror was withdrawn, he had taken the whole benefit of the act of 1829, and stood in the situation of a defendant before its passage. Unless I am much mistaken this is the construction the act of 1817 has received in the circuit and county courts, in criminal and civil causes; and the practice under it should be pursued, unless plainly opposed to its provisions. Furthermore: the practising lawyers, officers of court, and the community, have believed this to be the meaning of the act, as I imagine; at least so is my understanding. Where a construction is doubtful, hardly any authority can be relied upon with more safety, as is said in Allen vs. Huff, 1 Yerg. Rep. 409.
It is asked, suppose more than one juror sicken, shall the defendant be deprived of half the panel, and have no challenges ?
The State has the right to challenge, with or without cause, every juror. If without cause, he stands aside until the panel is exhausted, when the defendant has the right, for want of jurors, to call him.
The act of 1817, gives the State the right, by direction of the court, to withdraw the sick juror after empannelled and sworn, as if challenged, and which places the defendant in the same situation as if he had elected the juror, and then the State had challenged him for cause.
Suppose the Slate had challenged the juror that sickened, for cause, before he was sworn? Then the defendant would only have had eleven jurors, and his five challenges been exhausted. The truth is, the legislature was providing for the probable case of a juror taking sick during the progress of the trial, and declare another shall be sworn in his stead, and here the matter to end.
If Judge Whyte’s opinion be correct, that the whole panel is broken up when the sick juror is withdrawn, then I admit the prisoner has the right to challenge all the *182 Jaw allows him. But what is the consequence? The de- . , u ven jurors shrink back into the common mass of all summoned. Out of those previously challenged, as well as the eleven selected and discharged, the second jury must be formed de novo: whereas, the practice is, not to discharge the eleven, or to put to the defendant a juror previously challenged; which is the true meaning of the statute, 1 have no doubt. Thus giving the defendant the benefit of all his challenges and selections, save the juror rendered incompetent by sickness, whom the statute gives the State the right to challenge for this cause, after he shall have been sworn.
Judgment reversed.